Mr. Bell. Thank you, Your Honor. May it please the Court. I'm Kenneth Bell. I'm the receiver in the Rex Venture Group matter and hope that, as my wife suggested yesterday, I do not have a fool for a client. We hope that, too. I'm representing myself here today. The question before the Court is whether the district- Excuse me. Since Judge Shedd's a genius, he'll be able to help you today. I think that an agency just took an official position. I'm not, but thank you. The question before the Court is whether the district court had contempt jurisdiction over a Moldovan bank that used its New York correspondent account to put funds subject to its freeze order beyond the reach of the court. Or put differently, can a Moldovan bank use its New York correspondent account, which it uses to transact tens of millions of dollars' worth of business? Can it purposefully use that account to violate a district court's order freezing receivership assets to put those assets beyond the reach of the court and then show up in court and say, and judge, by the way, there's nothing you can do about that? That's the essence of the question before the Court. Just by way of factual background, the Zeke Rewards Ponzi scheme lasted just 19 months but created over 800,000 victims, losing over $800 million in over 150 countries around the world. Late in 2012, late spring of 2012, the U.S. banks were figuring out that Rex Venture Group or Zeke Rewards was not a business that they wanted to get anywhere near and they were having trouble finding ways to receive money from the victims of Zeke Rewards. And so one of the alternatives they had to traditional banking was that they used what are called e-wallets, which is sort of like PayPal, but people open an account, the affiliates are victims of it, they would charge their credit card to PESA, in this case, one of the e-wallets, and create an account from which they could buy from Zeke Rewards. PESA, in turn, used a credit card processor to process those credit cards. Now PESA itself was a bit of a troubled merchant and couldn't get a credit card processor that handled more legitimate, if you will say, kind of merchants. So Payment World U.S. had a relationship with a company called Payment World Hong Kong, which was owned by a Russian national named Victor Korkin. And Payment World Hong Kong had an agreement with Payment World U.S. that they would find overseas banks for merchants that would not be touched or handled by U.S. domestic banks. Some merchants in the U.S. were so risky that even Payment World Hong Kong was unwilling or unable to find merchant banks for them. And so Mr. Korkin introduced Mr. Platon, excuse me, Mr. Blanco, who is the principal of Payment World U.S. Mr. Korkin of Payment World Hong Kong and Mr. Blanco of Payment World U.S. met with a man named Platon in Moldova in early 2012 to try to find a bank that would be used to defraud the Zika rewards victims. According to Mr. Blanco's sworn deposition testimony, Mr. Platon of what eventually became Payment World Moldova claimed that he was a majority or significant shareholder in Victoria Bank in Moldova and that he would arrange for Victoria Bank to take on these duties on behalf of PESA, but there must be an entity in which he had an interest. It seems to me you need to cut to the chase of your argument on this more than just walking through what people said and didn't say. You're going to run out of time and not be able to make your specific argument. Thank you, Your Honor. What is your argument here? Tell me what your arguments are. By the way, I've read all this, but we need to cut right to that, I think, if you want to have a consideration of what you do. The essence of the argument is that, first of all, the district court limited our discovery, and the reason I was going through that history is to show what we do know, because I think by a prima facie standard for jurisdiction, which is what the court, district court, should have applied. Is your argument that the court held you to too high a standard with, concomitant with limited discovery? Correct, Your Honor. In other words, you, if you're going to limit, if you argue that the district court is going to limit your discovery, then it's difficult and incorrect to force you to meet a preponderance of the evidence, and the court should either give you a more realistic standard, prima facie or whatever else you might say, with limited discovery, or give you more discovery if it wants to impose the preponderance of the evidence. Is that correct? That's exactly the argument, especially since, you know, in the district court blow, we did argue to the district court that there was a lot of discovery here that we wanted to conduct. What discovery do you need, generally? Of whom do you need? Mostly of Victoria Bank, because the questions here, I mean, first of all, whether there's jurisdiction is tied up. Is it the case that you want to find out more about Victoria Bank, what they did, ownership interests and all, to see if there's a basis to have jurisdiction over them? As an initial point, yes. We first need that discovery to carry a preponderance burden of jurisdiction. I think we have it now under prima facie, but to carry a preponderance burden, we need that discovery, but also for the district court to ultimately determine whether Victoria Bank, if it has jurisdiction over it, did commit an act of contempt by moving that money through the Bank of New York, Mellon in New York. Are you seeking discovery over any other foreign entities other than Victoria Bank, for example, P.W. Hong Kong or P.W. Moldova? It would be our fervent hope to do so and a very low expectation of accomplishing it. What was the district court's rationale? That was hard to determine from the record for limiting you to the United States. I don't know, Your Honor. I made the argument, I think personally, and I made it twice, that we really needed and that it was fair and just to have discovery of Victoria Bank, and the district court just said no. In fact, I think one of the quotes in the first hearing was, see what you can find out within the U.S. You made some statement when you opened something about the bank in, I thought you said the bank in New York said we can do what we want to and you can't do anything about it? No, no, no, not the bank in New York. Victoria Bank. Victoria Bank. It wasn't a correspondent bank. Right, because by virtue of Victoria Bank arguing that the district court doesn't have any jurisdiction over it, no matter what, no matter that we use the correspondent bank in New York, no matter that we've run tens of millions of dollars through that account, you can't touch us. Now, this court may decide that is the law, but I hope it isn't. And so what we would like to do Well, they might be right in that argument, but you think they're wrong and you just think when you play with the standard that you have to show and the amount of discovery you're allowed, that has to give you a fair chance to make the argument. Whatever the court makes of you, they have to allow you to have access to information to be able to have a fair chance to meet that burden. That's exactly it, Your Honor. We understand that eventually we'll have to carry the burden by a preponderance on jurisdiction as well as in persuading the district court that contempt did actually occur here, but we can't do that if our hands are going to be tied to the U.S. only. Most of the relevant information is in Moldova with payment warrants, excuse me, with Victoria Bank. You think if you've got discovery on Victoria Bank, that would suffice to give you the information you need if you have an argument to be made to meet that preponderance of the evidence standard? Is that all you, I know you said you wanted more other people, but do you think if you get discovery against Victoria Bank, that will be sufficient? I don't know that it will because I won't tell this court that that's all I'm going to try to get. I don't mean sufficient to carry the burden because you don't know what the discovery might show. Exactly. But sufficient for you to be able to, that's the only party, I must ask, is that the party you need discovery against to meet your burden? It may be sufficient, but I don't know that it would be exhaustive. But that's where my highest hope is. I mean, frankly, Your Honor, I don't know that there is a Payment World Hong Kong to get discovery from. I don't know that there's a Payment World Russian Federation where this money actually wound up, if there's anything there to have discovery. I would hope to get some discovery from the Moldovan Central Bank, if that's the right term from it, so that perhaps verify some of what we're being told by Victoria Bank. But really, the essence of it will come from Victoria Bank because things we would like to know is, in 2012, not today, because Victoria Bank's... Do you think that we even get into the question or we resolve the question of whether or not the freeze order violated anything? Because there was an order filed in Moldova that you didn't domesticate that order, did you? No, and it wouldn't have made any difference if I had. And you have an affidavit in the record saying that? No, I'm just looking at the calendar, Your Honor, because we learned of the existence of receivership assets in Moldova in early September. Then what argument do you have that that is somehow a contempt? What's your argument that you'd say it didn't make any difference? No, I'm saying it made no difference whether we tried to domesticate the order. Victoria Bank can be in contempt of the court's order without it being domesticated. If it exposed itself to jurisdiction here in the United States, which it did, as we and not complying with that freeze order, whether or not we domesticated it in Moldova. And as a practical matter, we could not have. We sent a letter to them because it was only by then we knew, in September 11th of 2012, that they admit was received by September 17th, saying, we believe you're holding money. Here's a copy of the freeze order. Please do not disperse. Eight days later, it's gone. I'm just following this. You say domesticating the order doesn't matter because if there's jurisdiction over them and they had notice, they could still be responsible for violating the order. Correct. And as a practical matter, domesticating it wouldn't have made any difference. It could not have happened in the eight days between our letter and the money being gone. If that's the requirement, this will never work. Would you prefer to be here with there having been a domesticated order that they violated? No, Your Honor. It wouldn't make any difference to me. Because however long it took us to domesticate that order, and I don't know how long it would have taken, but more than eight days. If we walked in here and said, Your Honor, we had a domesticated order that is no good to us because it was domesticated three months after the money was gone. So I can't point to the domestication of that order as giving us a leg up at all. But that wasn't my question to you. I said, would you rather stand here with a domesticated order that they had violated? And that's what I was trying to. The answer would be yes, I take it. Yes. I wish that I had a domesticated order that they violated by sending the money after I got that order. I didn't ask you all that. But that's the only. You know what? Why don't you answer my question and then maybe you think it's a negative, too. I'm trying to do that. No, I don't think so. No, you're not. I said, wouldn't you rather be standing here if you had a domesticated order that they violated? And the answer has to be yes. Sure, but it couldn't have happened. But you want to respond by saying, I wish I had that. It would have strengthened my case. But in this, your argument is in this case, that wasn't even a possibility because of the timing. Correct. Sure, that would. And I'm sorry for misunderstanding Your Honor's question. Yes, I would prefer it. But it couldn't have happened. But it couldn't have happened. Because it would really show that they had done something extra legal or illegal under even their home law. Yes, Your Honor. That's my point. But you say you didn't have it. But you say there's a justification. And it doesn't really make any difference to your argument. That's exactly right, Your Honor. Mr. Bell, I'd like to direct you to your prayer for relief. You're speaking to us in very general terms. And I just want to make sure that I'm clear on this. You're asking us to hold that the court applied the incorrect standard. Correct. It held you to too strong a standard. You aren't asking us for any jurisdictional analysis in this case. No, Your Honor. No. You simply want a remand for further discovery and the application of the proper standard. Is that correct? Correct. And I would think that the best course going forward would be for this Court to suggest to the District Court that the jurisdictional facts and the merit facts are so intertwined that full discovery should be allowed to go forward and the District Court consider whether it has jurisdiction after full discovery and whether Victoria Bank was in contempt of its order. If the Court could also listen to arguments on how much discovery it should allow, as they do in cases all the time. You would make that argument. They're so combined. They're so intertwined. We need to do them all at one time. I suspect the other side would disagree with that. But the Court can decide that. Do you think that if we were to instruct that kind of discovery for you to get at least jurisdictional discovery, whatever that is, that then the preponderance of the evidence would be the appropriate standard? It depends how. In other words, if you get what you need to make a jurisdictional argument, the right standard is preponderance of the evidence. Correct. It's on you to prove it. If we're allowed sufficient discovery on the jurisdictional element, however that's defined by the District Court, but yes, then we would be subject to preponderance. And any further questions? So, in trying to form good habits, as Judge Shedd suggested to one of the others, I'll sit down while I still have some time. Mr. Mesa? Thank you, Your Honor, and may it please the Court, I'm here appearing specially on behalf of Victoria Bank. I am not Victoria Bank. And Victoria Bank is not in this courtroom, but it is represented by a lawyer. Noted. Thank you, Your Honor. The receiver argues, fundamentally, that if a foreign bank with no presence in the United States except for a correspondent bank account. And use of that bank account on 21 occasions. Well, the use of the bank account on many more than 21 occasions. I mean, the bank account has been in existence since 2009. Well, in terms of this particular client of the bank, Payment World Moldova, there were multiple occasions on which the client, Payment World Moldova, directed Victoria Bank to pay somebody. And that payment was routed through the correspondent bank account in New York at Bank of New York Mellon. Which is the way correspondent banking account works every single time. And which the court, the district court, specifically found as a fact was the way correspondent banking account works every single time. That is, the funds, the transfer of funds is always directed by the owner of those funds. In this case, Payment World Moldova. Now, we'll get into burdens and standards and so on, but that is a fact that the district court found, which can only be upset under the clearly erroneous standard. And it's not clearly erroneous, and there's certainly been no showing that that finding of fact is erroneous in any respect. But you suggest that that fact itself means that as a matter of law, you win? No, Your Honor. It's more complicated than that. I hope so. Trust me, and my view is if there's a correspondent bank involved, I guarantee it's more complicated. Well, that's probably true too. Because they're a little onerous sometimes in the things that they... They seem to be very wise at figuring out a way to do banking and claim they don't know and have nothing to do with it. Well, that may be the case, but that may be a different case than this case as well. Again, what the receiver is arguing is if a foreign bank whose only connection to the United States is that it has a correspondent bank, which is used in the course of international commerce, some of it... I mean, in this case, the funds went from Moldova to the Tussar Bank in Russia. It had nothing to do with the United States other than that it was a dollar-denominated transaction. Therefore, it went through BNY Mellon. What he's saying is that any injunction that is issued by a United States district court is enforceable through contempt power against that foreign bank. And that is so regardless of the laws in which the foreign bank operates, that is, the country in which it operates, regardless of whether its own laws would permit some interference with that transaction, and regardless of whether the party procuring the injunction, in this case, Mr. Bell, the receiver, had domesticated that injunction in the foreign country in which the bank operates and through the courts of that foreign country to whose jurisdiction it is clearly subject. He did make inquiries, and he was told it would take years. Isn't that correct? Well, there's nothing in the record that says that, Your Honor, other than a statement from Mr. Bell. Okay, well, let me direct you to your brief, which is a little bit different subject. Where you say on page 22, you start with the section that the district court provided the receiver with ample opportunity to develop jurisdictional facts, and that the only limitation was that it had to occur in the United States. Well, this is an alleged international Ponzi scheme, so how could limiting it to the United States be a reasonable course of action on the part of the district court? Let me address that question as well, because, again, what this does is fold into another different level of review. Answer that question clearly for us, and we'll take it from there. But let me give you the context, and I will answer the question. The level of review we're talking about here is the discretion of the district court to control discovery in its court. And, again, the standard that has to be met by the receiver in order to upset what the district court did was the district court abused its discretion by limiting the discovery in this fashion. The district court did not abuse its discretion by limiting the discovery in this fashion, even assuming the district court actually limited it to the extent that the receiver says the district court limited it. Well, you say, I'm reading your brief at 23, that the only limitation was that it had to occur in the United States. Right. And that's using the Federal civil rules of procedure limited to the United States. That does not mean, for example, that the district court would not have entertained a request from the receiver that letters rogatory be sent to Moldova. Mr. Bell says, I want to take some discovery from the Moldovan National Bank. Well, he's going to probably need to use letters rogatory to do that. He could have done the same thing with Victoria Bank. But let's just talk about Federal rules of civil procedure in the United States, which clearly the district court said is what I'm talking about here. But the discovery had to occur in the United States. That's suggesting place to me, and you're saying it's not place? I'm not sure that he meant it in those terms. He's talking about things that are readily procurable by me, district court, or enforceable by me, district court, sitting in Charlotte, North Carolina, you know, with respect to information that is available through processes that I control. And this came in a context in which he and the receiver were actually having a colloquy, if you look back at the full page of 678, or maybe a page earlier than that, about Mr. Bell saying, well, I'd like to do discovery of Victoria Bank. And the judge essentially saying, well, they're going to just tell me that I can't order them to do discovery because they're not within the ambit and the power of this court. So what do you want me to do? And Mr. Bell says, well, I thought I'd already persuaded you that they were within the power of the district court. And the district judge says, well, you haven't quite yet. What do you want me to do? And he says, I will allow you to take discovery in the United States. Start with the payment world guy, Mr. Belanco. And this is where we come to the propriety of the limitation that the district court made with respect to the discovery there. Again. So you won't oppose a discovery as to Victoria Bank if they use letters rogatory or the proper source. You don't, you don't, you would agree to that then? Your Honor, they haven't asked for it. I didn't say they did. I said you would agree to it. It depends on what they ask for, the manner in which they ask for it, and a lot of different factors. Say that to be no. Well, the answer is not no, no. But again, it just depends on what they ask for. The lawyers know. The district court was very. . . You stand going and talking about what the judge said. The judge is just saying, I can't help you because I can't get to them here. You say they don't know. They've got to do letters rogatory and other ways to get there. So I just thought the natural question is, if they do that, then you have no objection. But you go, oh, yeah, but I probably do. Well, it depends on what they ask for because the district court was very focused on, I do not want this to be a fishing expedition. And what is the definition of a fishing expedition? Something that's very broad and of marginal, perhaps, relevance. No, I think it's where you really don't know what you're looking for, what you're looking to learn. But you're looking for something. But they said they want jurisdictional facts. Well, okay. And if they list out specific jurisdictional facts that they want, we'll figure it out. To me it sounds like you don't oppose to the court using this authority to order discovery as to Victoria Bank. You just want to work out the details of it. Is that correct? I think that in the main is correct. But, again, it all depends on what is asked, the forum in which it is asked, and so on. But that's not to the fact of discovery. That's to how discovery is conducted. Letters, that is exactly how letters rogatory work. And we are not saying we will object to any request that's made in the proper manner, using the proper procedures with the proper forum. I am not saying that. And if that was the impression I gave you, I'm not. You didn't give me any impression. I was just asking a question. And the question is, as I understand it, you don't object to discovery as a matter, in this case, on jurisdictional facts, reserving the right to object to certain things that they want to discover. And you have those rights. Let me give you an aside. I remember a little while ago when there was a question. I said, what do you want? And the other side said, I want the same kind of substance and jurisdiction. Well, I went, isn't that what we leave to a district judge? And he kind of said, yes, it is. Exactly. And I'm saying, well, I think we've worked out a deal here. You all would agree. You're all in favor of discovery, and those would just be typical discovery disputes that you work out in front of the district judge. But, Your Honor, again, it's a little more complicated than that. And here's where it gets more complicated than that. Where this comes out is the context. The context is the receiver who started this proceeding with making no mention whatsoever about Victoria Bank's alleged involvement with PaymentWorld or any of the various PaymentWorld entities. And Mr. Bell is very careful to say there are three of them. He doesn't really think there are three of them. He thinks there's one of them. And they're all mashed together. So what? He now wants to take discovery to see what there is within objections you can raise and allow discovery. Here's why it matters. Okay. Belanco, the PaymentWorld U.S. guy, who is apparently the source of the information that suggests that Victoria Bank is somehow in the ownership structure, the judge says, go take his deposition. In fact, Mr. Bell said, I'm already scheduled to take his deposition. That's, again, on the same page that Your Honor was referring to. And it turns out that, in fact, he doesn't know, has no personal knowledge whatsoever about any of these alleged jurisdictional facts that show some kind of a co-ownership. And he certainly doesn't know any kind of fact that would suggest. Well, then why don't you use all that to oppose any specific type of discovery? Maybe there will be some discovery that they'll want to get that you won't object to, which I don't know if that's possible. But if you object to that on this basis, why isn't that played out to the district court? Because, again, Your Honor, what we're drilling down here is, what is the scope of the discretion that the district court has in this case, given what he was asked to do in this case, and given the information that he was supplied in this case? The receiver says, when I take Belanco's deposition, I will be able to substantiate all of these allegations that I have made based on what he's told me. District court says, fine, go do it. They do it. They are not able to substantiate any of those allegations because Belanco doesn't know. You've already told us that. Well, Belanco doesn't know. Therefore, it's hearsay. Therefore, does that mean that the district court can't ever use it? Not necessarily. The district court could use it. But the district court understands that Belanco is somebody that the receiver does not believe, that the receiver thinks is a liar. I don't understand. I do not understand why you're making this argument to us. You're just making this argument to us that there should be no further discovery? Or what's the purpose of this argument? I hear it. It's interesting, but I don't understand the point. The purpose of the argument is to show this panel, which is reviewing the district court. To answer the question that all that should be done in this case has been done. There's no reasonable way to do anything. There's no reason to do more. It's to show this panel that the district court appropriately exercised its discretion to control the discovery process that it was willing to permit. Okay, but our case law says that essentially the party has to be entitled to afforded full discovery. Those are our words before the preponderance of the evidence standard is imposed. How is that done in this case? Well, the case, I think the case that you're referring to is the Grayson case, in which there was full discovery, but it was actually in a different case altogether. It was full discovery in the underlying case. There's not been full discovery. There's not been full discovery. But what the court. National Ponzi scheme. But what the court said in Grayson is a fair opportunity to address the jurisdictional issues. And that's exactly what the receiver got in this case, because the receiver said the jurisdictional issues are posed by Mr. Blanco, take the deposition of Mr. Blanco. Mr. Blanco, in fact, does not, is not able to substantiate any of the, and these are not questions that we posed. These are questions that the receiver posed to Mr. Blanco. He took the deposition. When you say he's not able to substantiate, then you said it might be hearsay. If he can't substantiate, then not a hearsay. It's just no information. There's no information. There is no evidence. When you raise the hearsay issue, I don't understand that. Well, I mean, there's no evidence because the, quote, evidence is hearsay of which he has no personal knowledge. So, therefore, there is no evidence. But somebody told him something that implicates Victoria principle, right? Well. Is that correct? He says, Blanco says, somebody told me that the guy that runs this company is a majority shareholder. Named that person? Yes, he did. Okay. Well, why would you stop at the first person and giving you the best spin on it? Blanco doesn't know anything. So then that's the end? Wouldn't you go to the next person in terms of a fair discovery as you agree? Well, if they want to take the deposition of Mr. Plattong, if they can find him, fine. What about principles of not your client, but you appear especially on behalf of arguing the law in this regard? Victoria bank principle. Again. Would you, as Judge Chet asked you a question, I'm going to ask you that. Would they submit themselves to a deposition? I don't think letters rogatory permits you to go through a deposition. I'm not that familiar with letters rogatory. That's why I said deposition. I didn't say letters rogatory. Well, I don't know that they would submit themselves to the jurisdiction of the court that they don't think they have, that they don't think has jurisdiction in order to provide deposition. Now, there's lots of other ways that the receiver can figure out who the owners of Victoria Bank are if he really wants to. For example, one of the principal shareholders of Victoria Bank that we all know of is the European Bank for Reconstruction and Development. One of the principal owners of the European Bank for Reconstruction and Development is the United States of America. And the Secretary of Treasury sits on the board of the European Bank for Reconstruction and Development. The receiver is already receiving help and information from the Department of Treasury. I don't understand this. If you say Mr. Belanco said in his deposition or his interview, whatever it was, I have been told by people these facts. And you go and answer a good question from the Chief Judge. Well, they can go try to find that guy. Well, isn't it true that you can consider the admissibility of evidence when it looks like hearsay if in fact there is, under that catch-all provision at least, it appears it's reliable and the other person is not available? Yes, you can. But it has to appear to be reliable. Wait, but that is a determination by a district judge subject to review by us, correct? Yes. And that's what the district judge did. Because what the district judge said is the evidence is murky and based on hearsay. And I'm not going to countenance that. Allow you to meet what? Meet a jurisdictional standard under the preponderance of the evidence. Because in order to meet that jurisdictional standard, which by this point was the preponderance of the evidence, what we're arguing about and what the receiver is really arguing about is I didn't get a fair shot at meeting the preponderance of the evidence standard. And the reason he did get a fair shot at meeting the preponderance of the evidence standard is because the sole basis of his evidence is balonco that the receiver himself thinks is a liar. And if that's the case, then why should the district court? We're going to ask him about that. But I can tell you this much. Cases are made every single day in this country by people who are liars. I agree. Every single day. I agree, Your Honor. And if you said evidence can't be used, it can't come in because that person is a liar, which translates into he told something that looked like it wasn't 100% the truth, there would be almost no testimony in courtrooms in this country. But, Your Honor, again, we have to come back to the standard that you must apply to the district court's decisions here. The district court's decision in terms of the limitations that it places on discoveries of abuse of discretion. An error of law is what? An abuse of discretion. Of course. If we think in response to the standard is you modified it somewhat by saying an opportunity for full disclosure and that was not allowed, that is an abuse of discretion in itself. Well, I think when you read the Grayson case, it is not full disclosure. The Grayson case says fair opportunity. I acknowledge that's what you said. I don't think it's necessary to say every word. We could say you could be right and we say in this case there was not an opportunity for full and that would be an error of law. That's my point. You could argue we would be wrong. Judge, don't say that. You would be wrong. But we have the authority to go, well, we appreciate your argument. We appreciate his argument. But that is an error of law because what they had in this case, district court, you erred in saying they did have that and that's an abuse of discretion. You're a good lawyer. That's how it goes. We're allowed to do that. You can make a very strong argument we shouldn't do that. But we can. But in order to do that, you would have to find that he did abuse his discretion. And what I'm suggesting. I told you, an error of law, there's no need to go around, an error of law is an abuse of discretion. I agree. If he did not apply the discovery standards appropriately, that is an abuse of discretion. I don't disagree with that at all, Your Honor. But what I'm saying is that when you look at what he was faced with. No, you're just making an argument that he didn't abuse his discretion because he made no error of law in how he handled it, both as what the guiding law is and how he responded under that guiding law. Right. And Mr. Bell is making the exact opposite argument. That's not surprising. One of us is wrong. And I think I know, at least I have an opinion about who it is. Obviously, you get the final word on who that is. That's just in 30 seconds or less. But can you tell me, because Mr. Bell will be able to respond to it. But why is it you say it's because he says his principal witness, Blanco, he believes he's a liar. How does that mean that their position is wrong or somehow cabined? Tell me. I don't understand that. Again. He believes Blanco is a liar. Tell me, how do you connect that? I think it goes to the issue of should the district court take into consideration evidence which everybody understands and acknowledges is hearsay. And the source of the evidence is somebody that the sponsor of the evidence, the source being Blanco and the sponsor being the receiver, the sponsor believes the source of the evidence is a liar. Yes, but that's what I think, and I understand Judge Shedd, when he alludes to courtrooms around the country every day, this is an $800 million Ponzi international scheme. These people clearly are adverse to the receiver. He's not getting people who acquire boys and acquire women. I don't understand what you mean. Prosecutors have to use people who have been involved in all kinds of nefarious activities, and they become the link to conspiracies and all kinds of things. So I don't understand how you understand because he has to deal with somebody who, even assuming you're right. Well, go ahead. And why don't you have additional circumstantial evidence to provide reliability, the fact that PW Moldova moved the money, what, eight days after it was found, after Victoria found out about the freeze? So why isn't that something? But, Your Honor, again, when you look at the full spectrum of the record in front of you, PW Moldova moved that money eight days or whatever the time period is, but PW Moldova didn't just go out of existence at that point. It moved $10 million or more worth of money over the succeeding year. At any point during that year, if the receiver had done what he should have done in the very beginning, which is domesticate this order and make it effective against Victoria Bank in Moldova, then we would be in a very different setting and a very different situation, as Judge Shedd pointed out with his questions earlier. But the receiver never did that. So really the case that's most appropriate and on point in this proceeding is the Reebok case, which Judge Mullen, which the district court relied on as very heavily, which said essentially the power, therefore jurisdiction in that sense, of the district court in an injunctive proceeding extends as far as the territorial jurisdiction of the United States, not just the particular court. We're not there. Where we are is beyond the territorial jurisdiction of the United States. And what the Reebok court says is you cannot, regardless of any of these other issues, you cannot make effective an order of the district court against a foreign actor unless that order is made effective against the foreign actor through the courts that govern and hold jurisdiction over that foreign actor in that foreign actor's home. And that's where we are. The court in Reebok was focusing on minimum contacts, wasn't it? Wasn't the court focusing on minimum contacts? Well, no. It does both. And let me point you to both, Your Honor. If you look at Reebok, the court has a, and this is on 49 Feb. 3, 1393, when it goes through a very extended analysis of the underlying facts, which included, for example But if this bank, if you acknowledge, for purposes of my question, they have minimum contacts to supply constitutional and jurisdictional basis in this country, you don't need to file a domesticated order against them, do you? Yes, you do. And you absolutely do. Because what Reebok says is you can't make that order effective beyond where you are, where that bank is, and haul that bank into your court, district court, and hold them in contempt. If, for example, obeying your order would put them at risk of disobeying the law of their forum, which is exactly what we have here. And again, that is a fact which the district court found, which is not clearly erroneous. In fact, it's not. It's incorrect to me that you have a bank that's headquartered somewhere else, and they do tons of business in the U.S. through various kind of people and agencies and other things. You know what would happen? Somebody who wanted to sue them would serve one of their agents or somebody they claim to be an agent in a business transaction involving the person who's suing them in this country. And then we would have a discussion about whether or not they would be jurisdiction. But, Your Honor, that's not this case. This case is not a case in which somebody is suing them. No, I didn't. When I asked you my question, I didn't say it was this case. I didn't say it was this case. I said I think on minimum contacts you could have minimum contacts which could give you jurisdiction over a bank. Potentially you could. That would not require a domesticated order in their country. You told me I was incorrect. Well, that is exactly the situation in Reebok. I didn't say it was exactly the situation in Reebok. That may be limited to its facts because when I proposed another way, you said, well, that's different facts. And I'm just suggesting to you, I'm not going to cite you a case, but it strikes me that the scenario I propose is probably almost assuredly the law. Well, and again, what we're dealing with in Reebok and what we're dealing with here is contempt power. Right, but Reebok was focusing on the absence of minimum contacts, was it not? In part. And this is where. Okay, we'll read the case. Yeah. At 49 F. 3rd, 1393, the Court goes through an analysis. It ends with, in fine, we do not agree that when a national of a foreign country allows the law of that country, follows the law of that country, in that country, it can be dragged halfway around the world to answer contempt charges arising out of a foreign court's ineffective order. Ineffective because it was not domesticated in that country. And then the Court goes on to say, but at risk of being unduly repetitious, we will put our discussion into the more traditional terms outlined by the minimum contact analysis. And so what the Court is saying is, if it's not domesticated, the federal district court does not have the power to reach out and grab that non-domestic actor. But in order to flesh out the analysis, we're going to talk about it in terms, in addition to what we just already talked about it, in terms of a minimum contacts analysis. And the minimum contacts analysis, I'm way over time at this point, is spelled out in the briefs. I do not need to go through it all over again. But essentially, there's a difference between maintaining an account and using an account. All right. Read the brief. It's in there quite extensively. I do appreciate the Court's indulgence. I apologize for going over. We let you. But I was answering questions. We understand. Thank you, Mr. Metha. Thank you, sir. Mr. Bell. And there are really only two things I want to try to respond to, first of all, and I hope it's not necessary, but with respect to Reebok, because that's sort of a long time from now, ultimate question case, but that case isn't anything like this case. In Reebok, first of all, there was full discovery. Everybody knew the facts. Nothing was in dispute. The Court could just rule. Was the bank in contempt and should we take action? But in Reebok, separate and apart from that, the bank in Luxembourg is where the money always was. The money in dispute was always in Luxembourg. Never left Luxembourg. Never came through a correspondent account in the U.S., wasn't part of it. Are you suggesting that's just the factual application of the concept of minimum contacts and there's nothing that we know of in law that you know of that says if you have enough minimum contacts, we just can't have jurisdiction over you? Right. That's exactly right, Your Honor. And to Your Honor's point earlier about domestication, that domestication is not, has nothing to do, frankly, with whether, if there are minimum contacts and the Court has jurisdiction, whether Victoria Bank was in contempt. Now, it may well be that they would have a defense to a contemptuous charge that my country wouldn't have allowed me to do it. That's correct. That could be a defense, which is disputed up to now. There's been no discovery on it. We certainly are not conceding that they had that obligation. But let's find out. Did you have the opportunity for full discovery? We did not, Your Honor. Opportunity. Why didn't you? Because the District Court limited us only to discovery within the United States. And I did not understand that to include getting letters, regulatory or other things outside of the United States as been suggested by Victoria Bank. That's not the way I read it. So you think that the September 25th transfer to the correspondent account at Mellon, that's why you don't need domestication for Victoria being susceptible to contempt for the freeze order? Correct. I think they're unrelated, Your Honor, because it's what gives us specific jurisdiction. And we're not arguing that the fact that they maintained this correspondent account or even the fact that they used it to move tens of millions of dollars, that that's what gives us specific jurisdiction here. It's moving this particular money that was receivership assets with full knowledge that the court's order said that it should not move that money and using a New York account to do it. That is what gives us specific jurisdiction. The domestication would have only allowed us to go into Moldova and get a Moldovan court to order Victoria Bank to do something. And whether or not... What discovery do you need to know? That's a fact that's accepted by the court that they moved that money. What we need to know, and it strikes me, it's just so very curious because... Not what strikes you. What else do you need to know? I want to know, for instance, who owned Victoria Bank on September 25th, 1912? To direct that be done. Pardon me? To direct that that be done. Both. Who owned it and who directed that money be moved? Because it may be some of the same people. Because Blanco testified, Corkin told me he owned a big chunk of that bank. Blanco testified, Platone, not just somebody told me somebody, Platone told me he owed a big chunk of that bank. We have a newspaper article that's in the record that says exactly that, backing up what he says on that. But Blanco... I don't know who on... You said Blanco's a liar. I would not believe everything Mr. Blanco says. Were you aware of the correspondent account with Mellon before you gave notice on September 11th of the freeze order? Pardon me, Your Honor, I think it's... Were you aware of the correspondent account in New York? No, Your Honor. Before, you were not? No. When did you become aware of that? Very many years after. What made you so aware? And we didn't know of the transfer until late 2015. I mean, for most of the last three years we've been working on this, we have been under the impression because we've been being told the money's there, we just have to figure out how to get Victoria Bank to let go of it. It wasn't until the end of 2015 where we learned that money was gone in September 2012 and has been gone for the last three years. That's when we went to the district court and said, Your Honor, that's contempt, and we ask you to so fine. So it's almost a retroactive of you going back to what you didn't know then, but that being the act of... Correct. If it makes you feel any better, sometimes I look at my bank account and money I thought I had is gone. I don't know if that makes you feel any better. It probably doesn't, does it? Thank you, Your Honor. Thank you so much. We're going to ask the clerk to adjourn the court, sign it down, and then we'll come down to Greek Council. This honorable court stands adjourned, sign it down. God save the United States and this honorable court.
judges: Roger L. Gregory, Dennis W. Shedd, Barbara Milano Keenan